IN THE SUPREME COURT OF NORTH CAROLINA

No. 314PA21

Filed 15 December 2023

PAUL STEVEN WYNN

v.

REX FREDERICK, in his official capacity as a magistrate, and GREAT AMERICAN INSURANCE COMPANY

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 278 N.C. App. 596, 863 S.E.2d 790 (2021), affirming an order entered on 15 January 2020 by Judge John O. Craig III in Superior Court, Orange County. On 17 August 2022, the Supreme Court allowed plaintiff's conditional petition for discretionary review as to an additional issue. Heard in the Supreme Court on 21 September 2023.

*Carlos E. Mahoney and Barry D. Nakell for plaintiff-appellee.*

*Joshua H. Stein, Attorney General, by Sarah G. Boyce, Deputy Solicitor General, Nicholas S. Brod, Deputy Solicitor General, and Lindsay Vance Smith, Deputy Solicitor General, for defendant-appellant Rex Frederick.*

NEWBY, Chief Justice.

In this case we consider whether magistrates can be sued in a statutory bond action under N.C.G.S. § 58-76-5 based on actions they take in their official capacities or whether sovereign immunity and/or judicial immunity bars suit. To answer this question, we must first determine whether magistrates are "other officer[s]" under

N.C.G.S. § 58-76-5. Because the provision's text, history, and broader statutory context reveal that section 58-76-5 encompasses only county, rather than state, officers, magistrates fall outside the scope of "other officer[s]" under the statute and accordingly retain their sovereign immunity. Additionally, we hold, in accordance with our established precedent, that judicial immunity applies to official and individual capacity claims. We therefore reverse the decision of the Court of Appeals.

Plaintiff alleges the following facts. In 2016, plaintiff owned two nearby properties in Mebane, North Carolina. Plaintiff lived at one property and rented the second property to his sister, Judy Wynn, and her twenty-four-year-old son, Robert Morris. Morris had suffered from severe mental health issues since he was a teenager and was diagnosed with schizoaffective disorder, schizophrenia, and bipolar disorder. In addition, Morris engaged in significant alcohol and drug use and was diagnosed with substance abuse disorders. When Morris did not take his medications, his conditions caused him to become violent towards others. As a result, Morris had been involuntarily committed to UNC Hospitals on several occasions, including three separate times during 2016. To monitor Morris's condition and medication compliance, Morris received regular visits at his home from the UNC Center for Excellence in Community Mental Health's Assertive Community Treatment (ACT) team. The ACT team provides medical support and treatment to individuals with severe mental illnesses who live at home in Orange County. Dr. Austin Hall, a psychiatrist at the UNC Center for Excellence in Community Mental Health, served

as the ACT team's Medical Director and provided psychiatric care and treatment to Morris.

During the week of 12 December 2016, Morris was living with Ms. Wynn at the Mebane property that she rented from plaintiff. Morris was not taking his medications, had not slept for three days, and stayed outside at night guarding the house with a crossbow. In addition, earlier that week, Morris drained Ms. Wynn's car battery to prevent her from leaving the house. Accordingly, Ms. Wynn informed the ACT team and Dr. Hall about Morris's condition. On the morning of 16 December 2016, Dr. Hall met with Ms. Wynn and Morris at the Mebane property, and upon evaluating Morris, Dr. Hall determined that Morris needed to be involuntarily committed. Dr. Hall returned to his office, prepared an Affidavit and Petition for Involuntary Commitment, and faxed it to the Orange County Magistrate's Office. Defendant, a magistrate in Orange County, received the faxed affidavit and petition.

Upon reviewing the affidavit and petition, defendant issued a Findings and Custody Order for Involuntary Commitment and faxed the custody order to UNC Hospitals so that Morris could be served and committed at the hospital. Defendant thought Morris was already at the hospital; however, Morris was still at his home in Mebane. Therefore, Morris was not served with the custody order on 16 December 2016.

On the morning of 17 December 2016, Dr. Hall called Ms. Wynn to ask if the Orange County Sheriff's Office had served Morris with the custody order and taken

him to UNC Hospitals. Ms. Wynn told Dr. Hall that Morris was still at the Mebane property. Dr. Hall then called defendant to ask about the status of the custody order, and defendant informed Dr. Hall that he faxed the custody order to UNC Hospitals. Dr. Hall explained that Morris was still at his home and accordingly told defendant he would again fax the documents to defendant so that Morris could be served at the Mebane property.

At 9:27 a.m., Dr. Hall again faxed the Affidavit and Petition for Involuntary Commitment to the Magistrate's Office, and Chief Magistrate Tony Oakley received the documents. By 11:02 a.m., Chief Magistrate Oakley had also received a copy of the custody order. He then contacted the Sheriff's Office and requested a deputy to serve Morris at his house. Around 11:20 a.m., Deputy Malcolm Hester retrieved the custody order from the Magistrate's Office and began driving to the Mebane property.

Meanwhile, around 11:00 a.m., plaintiff went to his sister's property to jump-start her car battery. After starting the car, plaintiff went inside Ms. Wynn's home not knowing that Morris was off his medication and experiencing a psychotic episode. After plaintiff entered the house, Morris used a crossbow to shoot plaintiff in the neck with an arrow, instantly paralyzing plaintiff. Ms. Wynn called 911 at 11:18 a.m. Deputy Hester arrived at the Mebane property with the custody order by 11:36 a.m., and emergency services arrived shortly thereafter. At that time, Morris was taken into custody.

On 17 September 2019, plaintiff filed suit against defendant, in his official

capacity as a magistrate, under defendant's official bond pursuant to N.C.G.S. § 58-76-5, and Great American Insurance Company, defendant's insurer. Plaintiff alleged defendant was negligent in faxing the custody order to UNC Hospitals rather than to the Sheriff's Office so that a deputy could serve Morris with the custody order at his home. Plaintiff sought damages under the bond in the amount of $100,000.

Defendant filed a motion to dismiss on 21 October 2019 asserting sovereign immunity, absolute judicial immunity, public official immunity, and that plaintiff otherwise failed to state a claim upon which relief could be granted. Great American Insurance Company also filed a motion to dismiss, joining in and adopting defendant's motion. On 6 January 2020, the trial court held a hearing on the motions, in which it heard arguments, reviewed the complaint, and considered briefs submitted by the parties. On 15 January 2020, the trial court entered an order denying defendant's motion to dismiss.[1] The trial court determined that the factual allegations in the complaint establish that defendant is not entitled to sovereign immunity or judicial immunity for the statutory bond action and that plaintiff stated a claim upon which relief could be granted against defendant in his official capacity.[2] Defendant appealed.

---

[1] The trial court also denied Great American Insurance Company's motion to dismiss. Great American Insurance Company, however, withdrew its appeal at the Court of Appeals and is therefore no longer a party to this appeal.

[2] At the hearing on the motion, defendant waived his argument of dismissal based on public official immunity. Thus, that issue is not before this Court.

On appeal, the Court of Appeals affirmed the trial court's denial of defendant's motion to dismiss. *Wynn v. Frederick*, 278 N.C. App. 596, 597, 863 S.E.2d 790, 792 (2021). First, the Court of Appeals held that N.C.G.S. § 58-76-5, which waives sovereign immunity for certain officials covered by a statutory bond, applies to magistrates. *Id.* at 601, 603, 863 S.E.2d at 794–95; *see* N.C.G.S. § 58-76-5 (2021) (waiving sovereign immunity for a "register, surveyor, sheriff, coroner, county treasurer, or other officer" to the extent of their respective bonds). The Court of Appeals explained that while magistrates are not specifically enumerated in the statute's list of officers, magistrates nonetheless fall into the statute's general category of "other officer[s]." *Wynn*, 278 N.C. App. at 602–03, 863 S.E.2d at 795. Thus, according to the Court of Appeals, section 58-76-5 plainly waived defendant's sovereign immunity. *Id.*

The Court of Appeals next addressed the issue of judicial immunity. The Court of Appeals held that "judicial immunity is [only] an available defense for judicial officers sued as individuals." *Id.* at 603, 863 S.E.2d at 796. According to the Court of Appeals, because plaintiff sued defendant in his official capacity, rather than in his individual capacity, defendant could not assert judicial immunity as a defense to suit. *Id.* The Court of Appeals thus categorically limited judicial immunity to suits in which judicial officers are sued in their individual capacity. *Id.*

Defendant filed a petition for discretionary review with this Court on 24 August 2021, and plaintiff filed a conditional petition for discretionary review on 3

September 2021. On 17 August 2022, this Court allowed defendant's petition for discretionary review and allowed in part plaintiff's conditional petition for discretionary review.[3]

In this case we consider whether sovereign immunity and judicial immunity are available defenses in a statutory bond action for a magistrate sued in his official capacity under N.C.G.S. § 58-76-5. We review de novo a trial court's denial of a motion to dismiss that raises immunity as a ground for dismissal. *White v. Trew*, 366 N.C. 360, 362–63, 736 S.E.2d 166, 168 (2013).

This Court has long recognized the doctrine of sovereign immunity, acknowledging that "[i]t is an established principle of jurisprudence . . . that a state may not be sued . . . unless by statute it has consented to be sued or has otherwise waived its immunity from suit." *Smith v. Hefner*, 235 N.C. 1, 6, 68 S.E.2d 783, 787 (1952). Unless waived, this protection extends to public officials of the State sued in their official capacities. *White*, 366 N.C. at 363, 736 S.E.2d at 168. "Waiver of sovereign immunity may not be lightly inferred[,] and [s]tate statutes waiving this immunity, being in derogation of the sovereign right to immunity, must be strictly construed." *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 538–39, 299 S.E.2d 618, 627 (1983).

Section 58-76-5 of the North Carolina General Statutes provides a limited

---

[3] The issue allowed in plaintiff's conditional petition for discretionary review is substantially the same as the judicial immunity issue we allowed in defendant's petition for discretionary review. We therefore address two primary issues on appeal.

waiver of sovereign immunity for certain officials covered by statutory bonds. Specifically, section 58-76-5 provides that "[e]very person injured by the neglect, misconduct, or misbehavior in office of any register, surveyor, sheriff, coroner, county treasurer, or other officer, may institute a suit . . . against said officer . . . upon their respective bonds." N.C.G.S. § 58-76-5. Prior to 21 July 2023, magistrates were statutorily required to hold a bond "conditioned upon the faithful performance of the duties of the office of magistrate."[4] N.C.G.S. § 7A-174 (2021) (repealed 2023). Therefore, we must determine whether N.C.G.S. § 58-76-5 waives sovereign immunity for magistrates sued under their official bond. To do so, we examine the text and structure of section 58-76-5, its broader statutory context, and the provision's statutory history.

Our primary goal in construing a statute is "to ensure that the purpose of the legislature, the legislative intent, is accomplished." *Elec. Supply Co. of Durham v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991) (citing *Hunt v. Reinsurance Facility*, 302 N.C. 274, 288, 275 S.E.2d 399, 405 (1981)). When

---

[4] The General Assembly repealed the statutory bond requirement for magistrates in N.C.G.S. § 7A-174 effective on 21 July 2023. *See* An Act to Make Various Changes and Technical Corrections to the Laws Governing the Administration of Justice, As Recommended by the Administrative Office of the Courts and to Allow for the Expunction of the Offense of Breaking and Entering of a Building with Intent to Commit a Felony or Larceny and Amend the Conditions that Result in a Petition for Expunction Being Denied, S.L. 2023-103, § 5(b), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2023-2024/SL2023-103.pdf. Because plaintiff initiated this statutory bond suit against defendant prior to the repeal of N.C.G.S. § 7A-174, plaintiff's rights have vested. Accordingly, we consider the issues presented in the appeal.

construing a statute, we first examine "the plain words of the statute," *id.* (citing *Burgess v. Your House of Raleigh*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990)), as "[t]he best indicia of [legislative intent is] the language of the statute" itself, *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). If the plain language of the statute is unambiguous, we "apply the statute[ ] as written." *N.C. Dep't of Correction v. N.C. Med. Bd.*, 363 N.C. 189, 202, 675 S.E.2d 641, 649 (2009). If the plain language of the statute is ambiguous, however, we then look to other methods of statutory construction such as the broader statutory context, "the structure of the statute[,] and certain canons of statutory construction" to ascertain the legislature's intent. *Elec. Supply Co. of Durham*, 328 N.C. at 656, 403 S.E.2d at 294; *see Meyer v. Walls*, 347 N.C. 97, 106, 489 S.E.2d 880, 885 (1997) ("Where words of general enumeration follow those of specific classification, the general words will be interpreted to fall within the same category as those previously designated." (quoting *Turner v. Bd. of Educ.*, 250 N.C. 456, 463, 109 S.E.2d 211, 216 (1959))); *State v. Lee*, 277 N.C. 242, 244, 176 S.E.2d 772, 774 (1970) ("[G]eneral words [that] follow a designation of particular subjects or things . . . includ[e] only things of the same kind, character and nature as those specifically enumerated." (quoting *State v. Fenner*, 263 N.C. 694, 697–98, 140 S.E.2d 349, 352 (1965))). Additionally, the legislature's intent may be revealed from the legislative history of the statute in question, *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001), as changes the legislature makes to a statute's text over time provide evidence of the

statute's intended meaning, *Elec. Supply Co. of Durham*, 328 N.C. at 656, 403 S.E.2d at 295.

Here we must determine whether N.C.G.S. § 58-76-5 applies to state and county officials or only county officials. We start with the text of the statute. The plain language of section 58-76-5 provides a right of action against "any register, surveyor, sheriff, coroner, county treasurer, or other officer" under their respective bonds. N.C.G.S. § 58-76-5. The text of section 58-76-5 reveals that magistrates are not specifically included in the statute's enumerated list of officers. Therefore, we next examine section 58-76-5's internal structure and its broader statutory context to determine whether the legislature intended magistrates to fall within the statute's scope of "other officer[s]."

We often utilize canons of statutory construction to aid in discerning the legislature's intent. In *Meyer*, this Court invoked the canon *ejusdem generis* to determine whether a local entity fell within the scope of the general terms "departments, institutions, and agencies" in the State Tort Claims Act. 347 N.C. at 106, 489 S.E.2d at 885 (quoting *Turner*, 250 N.C. at 462–63, 109 S.E.2d at 216). According to that canon, "[w]here words of general enumeration follow those of specific classification, the general words will be interpreted to fall within the same category as those previously designated." *Id.* (quoting *Turner*, 250 N.C. at 463, 109 S.E.2d at 216). Thus, in *Meyer*, we concluded that the local entity fell outside the scope of those general terms because all of the "departments, institutions, and

agencies" specifically enumerated within the statute were state entities. *Id.* at 104, 489 S.E.2d at 884.

Here a closer reading of the enumerated list of officers in section 58-76-5 reveals that five specific categories of officers—registers, surveyors, sheriffs, coroners, and county treasurers—precede the more general phrase "or other officer[s]." *See* N.C.G.S. § 58-76-5. Significantly, each of the five specifically-enumerated officers are county officers rather than state officers such as magistrates.[5] Under the canon of *ejusdem generis*, "other officer[s]" fall "within the same category as those previously [and expressly] designated" in section 58-76-5. *Meyer*, 347 N.C. at 106, 489 S.E.2d at 885 (quoting *Turner*, 250 N.C. at 463, 109 S.E.2d at 216). Because the specifically-enumerated officers preceding the general phrase in section 58-76-5 are all county officers, the structure of section 58-76-5 counsels in favor of reading "other officer[s]" to include only other county officers. A contrary reading of the statute to include *any* "other officer" required to be bonded would render the statute's specific reference to registers, surveyors, sheriffs, coroners, and county treasurers unnecessary. *See id.* ("[I]f the legislative body had intended the general words to be used in their unrestricted sense the specific words would have been omitted." (quoting *Turner*, 250 N.C. at 463, 109 S.E.2d at 216)); *see also Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016) ("Courts should 'give effect to the words actually used in a statute' . . . ." (quoting

---

[5] The parties do not contest that magistrates are state officials.

*Lunsford v. Mills*, 367 N.C. 618, 623, 766 S.E.2d 297, 301 (2014))).

Reading section 58-76-5 to include only county officers is also consistent with how the General Assembly structured the provisions governing official bonds over one hundred years ago. In the early 1900s, Chapter 9 of the Revised Code contained all of the statutes governing official bonds. *See* N.C. Revised Code of 1905, ch. 9 (1905). Chapter 9 consisted of eleven articles, one of which was entitled "State Officers" and another of which was entitled "County Officers." *See id.* §§ 287–306. The two articles regulated the official bonds for the state and county officers specifically enumerated within each article. The "State Officers" article included state officials, such as the secretary of state, treasurer, insurance commissioner, clerk of supreme court, and public printer. *See id.* §§ 287–88, 290, 292–94. Alternatively, the "County Officers" article expressly included officials such as county treasurers, sheriffs, coroners, registers of deeds, and county surveyors. *Id.* §§ 297–303. Most notably, each of the officers identified in the "County Officers" article of Chapter 9 of the Revised Code are the same officers that are specifically enumerated in section 58-76-5 today. None of the officers listed in the "State Officers" article are found in section 58-76-5. The General Assembly has therefore historically categorized the enumerated officers in section 58-76-5 as county officers. This historical classification reflects the General Assembly's intent that the statute provide a right of action against only bonded county officers, which necessarily excludes magistrates as state officers.

The broader statutory context of the articles governing official bonds today

similarly confirms that section 58-76-5 is limited to county officials. Articles 72 through 76 of Chapter 58 of the North Carolina General Statutes address official bonds today. Many of the provisions throughout the five articles include the same list of officers provided in section 58-76-5. *See* N.C.G.S. § 58-72-10 (2021) (governing the condition and terms of official bonds for "[e]very treasurer, sheriff, coroner, register of deeds, surveyor, and every *other officer of the several counties* who is required by law to give a bond for the faithful performance of the duties of his office" (emphasis added)). None of the provisions specifically address magistrates or magistrates' bonds. Additionally, many of the provisions within the five articles consistently reference county commissioners, who are heavily involved in the bond process for county officials. *See* N.C.G.S. § 58-72-25 (2021) (tasking the board of commissioners with filling vacancies if an officer fails to renew his bond); N.C.G.S. § 58-72-60 (2021) (declaring every commissioner who approves an official bond that he knows to be insufficient liable as if he were a surety thereto). Conversely, county commissioners play no role in the process surrounding magistrates' bonds.[6] The differing procurement procedures for magistrates' bonds as compared to the procedures for bonds for county officers reflect the legislature's intent that magistrates are excluded from the scope of "other officer[s]" in section 58-76-5. Thus, not only has the General Assembly historically categorized the officers enumerated in section 58-76-5 as

---

[6] Magistrates' bonds are overseen by the Administrative Officer of the Courts, a state officer, who determines the amount by which magistrates shall be bonded and procures such bonds from the indemnity or guaranty company. *See* N.C.G.S. § 7A-174.

county officers, but the broader statutory context today also indicates that the General Assembly has intended to continue to limit section 58-76-5 to county officers.

The statutory history of section 58-76-5 further reinforces that the statute applies only to claims against county officers and does not extend to claims against state officials. In 1965, the General Assembly enacted the Judicial Department Act, which reorganized our state court system into its current structure. *See* An Act to Implement Article IV of the Constitution of North Carolina by Providing for a New Chapter of The General Statutes of North Carolina, ch. 310, 1965 N.C. Sess. Laws 369, 369–420. The changes transformed the State's more local, county-centric court system into one unified statewide system divided into an Appellate Division, a Superior Court Division, and a District Court division. *Id.* at 370 (codified at N.C.G.S. § 7A-4). As a necessary corollary of this transition "to a uniform system completely operational in all counties of the State," *id.* at 370, the General Assembly eliminated several local judicial offices, such as justices of the peace and constables,[7] and created several state judicial offices, such as magistrates, *id.* at 380–82 (codified at N.C.G.S. §§ 7A-170 to -176).

Because of this reorganization, the General Assembly twice revised section

---

[7] Constables were elected county officers who generally served under the justices of the peace in a specific township. N.C. Revised Code of 1905, ch. 9, § 302. They shared similar duties to the county sheriffs and could make arrests and enforce criminal laws throughout the county that their township covered. *See State v. Corpening*, 207 N.C. 805, 178 S.E. 564 (1935). Constables also often served as "collecting agent[s]." *Morgan v. Horne*, 44 N.C. (Busb.) 25, 26 (1852).

58-76-5. Both revisions reflect the statute's local focus on county officers. First, in 1973, the General Assembly deleted a reference to constables in an earlier version of section 58-76-5 (then codified at N.C.G.S. § 109-34) because the legislature had eliminated that office with the passing of the Judicial Department Act. *See* Act of Mar. 28, 1973, ch. 108, § 59, 1973 N.C. Sess. Laws 84, 88.[8] Notably, the General Assembly did not simultaneously add magistrates to section 58-76-5's enumerated list of officers. In the same session law, however, the General Assembly specifically added "magistrates" to several other provisions throughout the General Statutes. These deliberate decisions support the conclusion that "magistrates" fall outside the scope of "other officer[s]" in section 58-76-5.

Subsequently, the General Assembly deleted the office of "clerk of the superior court" from section 58-76-5's list of enumerated officers. *See* An Act to Make Technical Corrections to the General Statutes as Recommended by the General Statutes Commission and to Make Various Other Technical Changes to the General Statutes and the Session Laws, S.L. 2010-96, § 29, 2010 N.C. Sess. Laws 377, 385. This change was also a warranted consequence of the enactment of the Judicial Department Act and reflects section 58-76-5's local focus on county officers. Before 1965, superior court

---

[8] Constables were expressly classified as county officials in Chapter 9 of the N.C. Revised Code of 1905. This classification reinforces section 58-76-5's local focus and the General Assembly's historic consideration of the statute as encompassing only county officers. The deletion of constable—a county officer—from the list does not detract from the county-specific nature of the list. Rather, the deletion was necessary because the office no longer existed.

clerks were considered county officials, consistent with the local nature of our state's court system prior to the reorganization. Upon the enactment of the Judicial Department Act, however, superior court clerks became classified as state officials. *See* N.C.G.S. § 7A-101(a) (2021) ("The clerk of superior court is a full-time employee of the State . . . ."). Therefore, because superior court clerks were no longer classified as county officers, the General Assembly's deletion of superior court clerks from the statute was necessary in order to retain section 58-76-5's county focus.[9]

A broad reading of section 58-76-5 to include *all* bonded officials would render the legislature's deletion of superior court clerks from the statute's enumerated list of officers futile. Under this reading, superior court clerks would seemingly qualify as "other officer[s]" even after their express deletion from the statute simply because they were statutorily required to hold a bond. Such a reading, however, would fail to give effect to the legislature's specific amendment to the statute. *See Town of Pine Knoll Shores v. Evans*, 331 N.C. 361, 366, 416 S.E.2d 4, 7 (1992) ("[W]e follow the maxim[ ] of statutory construction that . . . [statutory] amendments are presumed not to be without purpose."). The changes the legislature has made to section 58-76-5 reflect the legislature's continued intention to confine the statute to county officers.

---

[9] Similar to constables, clerks of superior court were expressly classified as county officials in Chapter 9 of the N.C. Revised Code of 1905. The deletion of superior court clerks from the enumerated list of officers does not detract from the county-centric nature of the list. Instead, the deletion likewise reinforces the statute's local focus. The deletion was necessary in order to reflect superior court clerks' conversion from county officers to state officers with the enactment of the Judicial Department Act.

Section 58-76-5's internal structure, broader statutory context, and statutory history make clear that the General Assembly intended to limit section 58-76-5 to statutory bond actions against bonded county officers. We therefore hold that magistrates are not included within the scope of "other officer[s]" under N.C.G.S. § 58-76-5. Accordingly, N.C.G.S. § 58-76-5 does not waive defendant's sovereign immunity.

We next consider whether defendant may assert judicial immunity as a defense to plaintiff's official capacity bond claim. Because judicial immunity protects judicial officials from litigation arising out of acts performed in their judicial capacity, we conclude that judicial immunity applies to official capacity and individual capacity claims. The essential question is whether the judicial officer acted in a judicial capacity, or in the discharge of his official duties. The availability of judicial immunity as a defense does not hinge upon whether the plaintiff decided to bring an official capacity or individual capacity claim against a judicial officer.

It has long been recognized that judicial immunity is "a general principle of the highest importance to the proper administration of justice." *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871). "[A] judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* Recognizing this principle, this Court has broadly held that a "judge of a court of this State is not subject to civil action for errors committed in the discharge of his official duties." *Town of Fuquay Springs v.*

*Rowland*, 239 N.C. 299, 301, 79 S.E.2d 774, 776 (1954); *see also Hedgepeth v. Swanson*, 223 N.C. 442, 444, 27 S.E.2d 122, 123 (1943) ("[O]fficers acting in a judicial capacity or quasi-judicial capacity are exempt from civil liability and cannot be called upon to respond in damages to private individuals for the honest exercise of [their] judgment though [the] judgment may have been erroneous . . . ." (emphasis omitted)). Only when a judicial or quasi-judicial officer "acts corruptly or of malice" rather than "in . . . honest exercise of his judgment . . . is he liable in such a suit instituted against him." *Id.*

Despite this precedent, the Court of Appeals held that judicial immunity is a categorically unavailable defense to an official capacity claim against a judicial officer.[10] *Wynn*, 278 N.C. App. at 603, 863 S.E.2d at 795–96. The Court of Appeals reasoned, and plaintiff here similarly contends, that judicial immunity applies to individuals, while sovereign immunity applies to the State and its public officials in their official capacity. *Id.* at 603, 863 S.E.2d at 795. Therefore, according to the Court of Appeals, "[t]hese differences show that the doctrines of sovereign immunity and judicial immunity are not intended to be parallels applicable under the same circumstances." *Id.* at 603, 863 S.E.2d at 796.

Our case law, however, clearly establishes that judicial immunity protects

---

[10] In an official capacity claim, the plaintiff "seeks recovery from the entity of which the public servant defendant is an agent." *Meyer*, 347 N.C. at 110, 489 S.E.2d at 887. An official capacity claim therefore seeks damages from the State itself. *Id.* Alternatively, in an individual capacity claim, the plaintiff "seeks recovery from the defendant directly" and personally. *Id.*

judicial officers from liability when they perform judicial acts and presents a complete

and absolute bar to recovery regardless of whether the plaintiff brings an official or

individual capacity claim. In *Fuquay Springs*, for instance, this Court specifically

held that a judge could assert judicial immunity as a defense to an official capacity

claim. In that case, the town of Fuquay Springs filed suit against a judge in his official

capacity, alleging the judge had instructed the clerk of court to refrain from taxing

certain fees in select cases. 239 N.C. at 299–300, 79 S.E.2d at 775–76. The judge,

however, contended that the complaint failed to state a valid claim because the town

could not sue him in his official capacity. *Id.* at 300, 79 S.E.2d at 775. This Court

agreed and held that "[a] judge of a court of this State is not subject to civil action for

errors committed in the discharge of his official duties." *Id.* at 301, 79 S.E.2d at 776.

Accordingly, judicial immunity barred the plaintiff's official capacity claim against

the judicial official.[11]

Similarly, in *Hedgepeth*, the plaintiff brought an official capacity claim against

a county sheriff who "procur[ed] [a] search warrant for the plaintiff's premises and

---

[11] The Court of Appeals has consistently relied on *Fuquay Springs* in holding that public officials may assert judicial or quasi-judicial immunity when they engage in judicial acts pursuant to the discharge of their official duties. *See Price v. Calder*, 240 N.C. App. 190, 192–95, 770 S.E.2d 752, 754 (2015) (court-appointed commissioner had judicial immunity when overseeing a real property partition proceeding); *Bare v. Atwood*, 204 N.C. App. 310, 314–15, 693 S.E.2d 746, 750–51 (2010) (clerk of court had judicial immunity for acts in connection with partition of real property); *Sharp v. Gulley*, 120 N.C. App. 878, 880, 463 S.E.2d 577, 578 (1995) (family court-appointed referee had judicial immunity regarding equitable distribution determination for a marital estate); *Foust v. Hughes*, 21 N.C. App. 268, 270, 204 S.E.2d 230, 231–32 (1974) (magistrate had judicial immunity when issuing a warrant).

[a] warrant for [the plaintiff's] arrest." 223 N.C. at 445, 27 S.E.2d at 123. At the time, county sheriffs could enforce the law and also act in a judicial or quasi-judicial capacity in certain circumstances. Although the specific official capacity claim at issue ultimately involved a sheriff, we first noted the general rule that public officers acting in a judicial capacity may assert judicial immunity as a defense "for the honest exercise of [their] judgment though [the] judgment may have been erroneous." *Id.* at 444, 27 S.E.2d at 123. Therefore, in both cases, rather than basing our analysis on whether the plaintiff brought an official or individual capacity claim, we instead began with the general rule that officers are judicially immune from suit for acts performed in their judicial capacity and then considered whether the officer "committed [the error] in the discharge of his official duties," *Fuquay Springs*, 239 N.C. at 300, 79 S.E.2d at 776, or "act[ed] in a judicial capacity," *Hedgepeth*, 223 N.C. at 444, 27 S.E.2d at 123.

Here plaintiff sued defendant in his official capacity as a magistrate. Magistrates are judicial officers of the State. *See Foust v. Hughes*, 21 N.C. App. 268, 270, 204 S.E.2d 230, 231 (1974). Accordingly, under our precedent in *Fuquay Springs* and *Hedgepeth*, judicial immunity is an available defense to defendant. Because plaintiff's claim is independently barred by sovereign immunity, however, we need not consider whether defendant performed a judicial act in faxing the custody order

to UNC Hospitals.[12]

In sum, section 58-76-5's text, structure, and history make clear that the statute encompasses only county, rather than state, officers. Magistrates therefore fall outside the scope of "other officer[s]" under the statute and accordingly retain their sovereign immunity in a statutory bond action under section 58-76-5. Judicial immunity is also an available defense because judicial immunity applies to both official and individual capacity claims. Accordingly, the decision of the Court of Appeals is reversed.

REVERSED.

Justices DIETZ and ALLEN did not participate in the consideration or decision of this case.

---

[12] It should be noted that we discuss judicial immunity to correct a mistake made by the Court of Appeals which had limited the defense of judicial immunity. The dissent would go much further and summarily find defendant's conduct as not the type of conduct normally performed by a judicial officer, without the benefit of full briefing or argument on the issue. In fact, this Court specifically declined to consider how judicial immunity applies to the facts of this case by denying this very issue in plaintiff's conditional petition for discretionary review. Additionally, both parties concede in their briefs that this issue is not properly before the Court and would need to be remanded for its initial consideration.

Justice EARLS concurring in part and dissenting in part.

Across North Carolina, public officers at every level of government do their jobs with care and caution. Within their role, those officers are entrusted with "some portion of the sovereign power." *State v. Hord*, 264 N.C. 149, 155 (1965). But that "power, once granted, does not disappear like a magic gift when it is wrongfully used." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971). While most public servants faithfully discharge their duties, some do not. And even the best-intentioned officials make mistakes.

Recognizing that truth, our legislature granted citizens a path to relief: Bond actions. Before many public officers assume their role, they must secure bonds conditioned on the "faithful performance of the[ir] duties." *See, e.g.,* N.C.G.S. § 7A-174 (2021) (requiring magistrates to secure bonds as a condition of office). And in practice, those bonds protect "the public from any injuries caused by the public official" while "in office." *See* Jeffrey S. Price et al., *The Public Officials Bond—A Statutory Obligation Requiring "Faithful Performance," "Fidelity," and Flexibility,* 11 Fid. L. Ass'n J. 151, 160 (2006). When an officer's misfeasance causes harm, Section 58-76-5—the bond-action statute—allows injured citizens to sue that officer and his surety on the official bond. N.C.G.S. § 58-76-5 (2021).

By its terms, Section 58-76-5 sweeps broadly. It allows "[e]very person injured" to seek relief from an officer for "all acts" done "by virtue or under color" of his office.

*Id.* The statute also lists some officials within its ambit, authorizing suits against "any register, surveyor, sheriff, coroner, county treasurer, or other officer." *Id.* The precise question is whether magistrates are "other officer[s]" liable on their official bonds. If they are, then sovereign immunity does not bar Mr. Wynn's claim against Magistrate Frederick. At stake, then, is whether Mr. Wynn may have his day in court. Whatever the merits of his suit, he cannot raise it at all if the bond-action statute does not apply and sovereign immunity remains intact.

But despite the provision's broad scope and broad purpose, the majority reads "other officer[s]" to include just county officials. And since magistrates are state officers, the majority exempts them from liability on their bonds. But that county-officer limit is missing from Section 58-76-5's text. It also clashes with the rest of the statute's language and the provisions surrounding it. And most importantly, it runs counter to the purposes of official bonds and bond actions: To make citizens "secure in their rights" and provide "adequate remedy for wrongs" flowing from official misconduct. *See State ex rel. Kivett v. Young*, 106 N.C. 567, 569 (1890). Because the majority improperly extinguishes Mr. Wynn's access to the courts and chance for relief, I respectfully dissent.

## I.   Judicial Immunity Does Not Shield Magistrate Frederick for Nonjudicial Acts

Analytically, I would address judicial immunity first. I agree with the majority that judicial immunity is at play when a magistrate is sued in both his individual or official capacity. But capacity itself is not the key focus—what matters instead is the

nature of the magistrate's challenged conduct.

Judicial immunity attaches to acts, not offices. *Forrester v. White*, 484 U.S. 219, 227 (1988). Under that doctrine, a judicial officer is absolutely immune for his judicial conduct. *See Stump v. Sparkman,* 435 U.S. 349, 359 (1978). Magistrates are "judicial officers." *Bradshaw v. Admin. Off. of the Cts.*, 320 N.C. 132, 134 (1987); *see also id.* ("Our legislature has prescribed by statute many of the functions performed by magistrates, most of which require such independent judgment by a judicial officer."). And so here, the question is whether Mr. Wynn has sued Magistrate Frederick for a judicial act. If so, judicial immunity bars Mr. Wynn's claim. If not, we then ask whether sovereign immunity applies and whether the state has waived it.

At its core, judicial immunity safeguards the "independent and impartial exercise of judgment vital to the judiciary." *Antoine v. Byers & Anderson, Inc.,* 508 U.S. 429, 435 (1993). Still, an absolute bar to liability is "strong medicine." *Forrester*, 484 U.S. at 230 (cleaned up). So rather than woodenly insulating judicial officers, judicial immunity "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Id.* at 227; *see also id.* at 224 (explaining that immunity turns on "the nature of the functions with which a particular official or class of officials has been lawfully entrusted"). Courts have thus drawn a firm "line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges." *Id.* at 227. And so a judge's acts *as a judge* are distinct from "the administrative, legislative, or executive functions that judges may

on occasion be assigned by law to perform." *Id.*; *see also Sup. Ct. of Va. v. Consumers Union of U.S., Inc.,* 446 U.S. 719, 731 (1980). Anchoring judicial immunity in judicial acts aligns the doctrine with its purpose and historical roots. *See Antoine,* 508 U.S. at 432–36.

The "touchstone" of a judicial act is whether the officer performs the "function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Id.* at 435–36 (cleaned up); *accord Forrester,* 484 U.S. at 227 (describing "paradigmatic judicial acts" as those "involved in resolving disputes between parties who have invoked the jurisdiction of a court"). Courts also consider whether an act "is a function normally performed by" a judicial officer. *Stump*, 435 U.S. at 362; *see also Ex parte Va.*, 100 U.S. 339, 348 (1879) (declining to apply judicial immunity for conduct that "might as well have been committed to a private person as to one holding the office of a judge"). Relevant, too, is the officer's discretion in carrying out the conduct. *See Hedgepeth v. Swanson*, 223 N.C. 442, 444–45 (1943) (explaining that immunity protects "public officers acting in a judicial capacity or quasi-judicial capacity" when they are "engaged in official acts involving the exercise of judgment and discretion"); *Antoine*, 508 U.S. at 436 (withholding judicial immunity from court reporters transcribing proceedings because they are "afforded no discretion" in that task and must simply "record, as accurately as possible, what transpires in court"). But the key point is clear: A judicial officer is only immune for the "kind of discretionary decisionmaking that the doctrine of judicial immunity is designed to

protect." *Antoine,* 508 U.S. at 435; *see also Peavey v. Robbins,* 48 N.C. 339, 341–42 (1856) (granting immunity to election inspectors who were "acting judicially under a public law" and exercising "judicial power to adjudge upon the right of every man to vote at that precinct"). The reverse is true, too—judicial immunity does not extend to "such acts as are not judicial." *See Furr v. Moss*, 52 N.C. 525, 526–27 (1860).

Under that framework, Magistrate Frederick is immune for his judicial acts in considering and issuing the custody order for Mr. Morris. That decision required him to exercise discretion in "adjudicating private rights"—whether to involuntarily commit Mr. Morris. *See Antoine,* 508 U.S. at 436 (cleaned up); *see also* N.C.G.S. § 122C-281(b) (2021) (allowing a designated officer to issue a custody order if he "finds reasonable grounds to believe that the facts alleged in the affidavit are true and that the respondent is probably a substance abuser and dangerous to self or others"). And custody determinations are "normally performed by" a judicial officer. *Stump*, 435 U.S. at 362; *see also id.* at 364 (explaining that "controversial" decisions about the "liberty and character of the parties" are "being constantly determined in . . . courts" (cleaned up)).

But judicial immunity does not shield Magistrate Frederick for negligently faxing the custody order to the wrong place. Sending a fax—unlike resolving a custody request—is not the "kind of discretionary decisionmaking that the doctrine of judicial immunity is designed to protect." *See Antoine,* 508 U.S. at 435. In fact, it requires virtually no discretion at all. *See City of Bayou La Batre v. Robinson*, 785 So.

2d 1128, 1133 (Ala. 2000) (withholding judicial immunity from a magistrate because she was "executing an administrative duty that did not involve the exercise of judgment" when she faxed a "warrant-recall order to the police department upside down"). Sending a fax does not invoke a magistrate's "judicial or adjudicative" power, *see Forrester,* 484 U.S. at 229, nor require him to "exercise the kind of judgment" inherent in judicial decision-making, *see Antoine,* 508 U.S. at 437. Any person—whether a Supreme Court justice or a part-time secretary—goes through the same mechanical actions to fax a document. Because that conduct is not normally performed by a judicial officer, it "might as well have been committed to a private person," *Ex parte Va.,* 100 U.S. at 348; *see also Forrester,* 484 U.S. at 228. Mr. Wynn thus seeks relief from Magistrate Frederick for an "administrative" function beyond the embrace of judicial immunity. *See Forrester,* 484 U.S. at 228.

Since Magistrate Frederick is not judicially immune for nonjudicial acts, the next question is whether sovereign immunity bars Mr. Wynn's claim. When a plaintiff sues a state officer in his official capacity, the state itself is the true party in action. *See Meyer v. Walls*, 347 N.C. 97, 110 (1997) (explaining that an official capacity claim "seeks recovery from the entity of which the public servant defendant is an agent"). But the state—as a sovereign—is absolutely immune from suit unless it consents. *See Corum v. Univ. of North Carolina,* 330 N.C. 761, 785–86 (1992). Thus, Mr. Wynn may sue Magistrate Frederick in his official capacity for nonjudicial acts only if the state waived sovereign immunity from that claim.

## II. The Bond-Action Statute Waives Magistrates' Sovereign Immunity from Suit on their Official Bonds

Everyone agrees that the bond-action statute allows suit against covered officers when they cause injury through "neglect, misconduct, or misbehavior in office." *See* N.C.G.S. § 58-76-5. Mr. Wynn alleges that Magistrate Frederick "neglect[ed]" to send Mr. Morris' custody order to a proper law enforcement officer, thereby causing Mr. Wynn's injuries "by virtue or under the color" of his office as magistrate. *See id.* The question is whether the bond-action statute applies to Magistrate Frederick at all. If it does, then the state—by rendering magistrates liable on their official bonds—consented to claims like Mr. Wynn's. If it does not, then sovereign immunity remains intact. Because I would hold that a magistrate is an "officer" covered by the bond-action statute, I would allow Mr. Wynn to sue Magistrate Frederick on his official bond.

### A. Statutory Text

#### 1. *Ordinary and Legal Meaning*

Like the majority, I start with the statute's text. *See Correll v. Div. of Soc. Servs.*, 332 N.C. 141, 144 (1992). The bond-action provision, as the majority notes, does not expressly list magistrates. After mentioning some public officials, it reaches further, including "other officer[s]" within its compass. That language is broad, but intentional. In practice, that catch-all clause is a statutory safety net. By including it, the legislature expanded the provision beyond the specific officers it lists. Otherwise, there would be no reason to mention "other officer[s]" at all. And to

underscore the provision's breadth, the legislature did not attach any qualifier or limit to the term "officer."

When the legislature has not supplied a definition, we generally give a term its ordinary meaning. *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 550 (2018). In common use, an "officer" is "a person holding public office under a national, state, or local government, and authorized by that government to exercise some specific function." *See Officer*, *Black's Law Dictionary* (11th ed. 2019). Magistrates fit that description. The legislature created their position, *see* N.C.G.S. § 7A-170(a) (2021), set qualifications on it, *see* N.C.G.S. §§ 7A-171, -171.2, 171.3, 173, 177 (2021), and fixed the functions magistrates perform, *see, e.g.,* N.C.G.S. §§ 7A-211, 211.1, 213 (2021). So in ordinary language, magistrates are "officers."

That common meaning fits with common legal use. Other provisions of law classify magistrates as "officers." Our Constitution designates magistrates as "officers of the District Court" where they sit. N.C. Const. art. IV, § 10. Our statutes say the same. N.C.G.S. § 7A-170(a) ("A magistrate is an officer of the district court"); *see also* N.C.G.S. § 14-230(a) (listing magistrate as one "such officer" who is subject to criminal penalties for willfully failing to discharge official duties). And this Court has drawn on those provisions in labeling magistrates "judicial officers." *Bradshaw,* 320 N.C. at 134.

In reading statutes, this Court presumes that the legislature acts with awareness of the law. We presume that it chooses its words with care. We presume,

too, that it intends language to have its ordinary meaning unless it says otherwise. *Wilkie,* 370 N.C. at 550. Since a magistrate is an "officer"—both in common speech and broader legal parlance—I would give that word its "natural, approved, and recognized meaning." *Black v. Littlejohn*, 312 N.C. 626, 638 (1985).

### 2. *The Other Language in the Bond-Action Statute*

All the same, we do not interpret language in a vacuum. We read a statute with an eye towards its context and internal structure. *See Smith v. United States,* 508 U. S. 223, 229 (1993). But here, text, structure, and context point the same way: Throughout the bond-action statute, the legislature chose broad language to reinforce the provision's broad sweep. In defining the scope of a bond action, for instance, the provision focuses on the nature of the injuring act rather than the title of the injuring officer. It grants a right of action to "[e]very person injured" by an officer's "neglect, misconduct, or misbehavior in office." N.C.G.S. § 58-76-5. The "person injured" may sue the officer and the surety on the bond "for the due performance of their duties in office in the name of the State." *Id.* The provision closes with a broad statement of its purpose: An officer and his surety "shall be liable to the person injured for all acts done by said officer by virtue or under color of that officer's office." *Id.*

So the statute does not distinguish between state and county officers. Throughout, it refers to "every such officer," "the officer's official bond," and "that officer's office" without limiting these terms. And so taken as a whole, the text focuses on whether an officer caused injury "by virtue or under color" of his position and

official authority. This Court has recognized the language's sweep. The bond-action statute, we have explained, is "very comprehensive in its terms, scope and purpose." *Kivett*, 106 N.C. at 569. By enacting it, the legislature "enlarge[d] the compass of the conditions of official bonds and their purpose." *Id.* And rightfully so—that scheme tracked "serious" concerns of "justice and policy." *Id.* So the thrust of the statute's text and the principles animating it reach beyond the majority's cramped interpretation. *See id.* ("[S]uch officers, indeed all public officers, should be held to a faithful discharge of their duties as such. . . . So that now official bonds and the conditions of them embrace and extend to all acts done by virtue or under color of office of the officer giving the bond.").

### 3. *The Language of the Statute Requiring Magistrates to Secure Bonds*

Consider, too, the text of Section 7A-174—the provision mandating that magistrates secure a bond in the first place. N.C.G.S. § 7A-174. Starting in 1965, the General Assembly required magistrates to obtain bonds before taking office. *See* An Act to Implement Article IV of the Constitution of North Carolina by Providing for a New Chapter of The General Statutes of North Carolina, ch. 310, 1965 N.C. Sess. Laws 369, 382.[1] And the legislature conditioned those bonds "upon the faithful

---

[1] Just this year, the legislature repealed the statute requiring magistrates to secure bonds. *See* An Act to Make Various Changes and Technical Corrections to the Laws Governing the Administration of Justice, As Recommended by the Administrative Office of the Courts and to Allow for the Expunction of the Offense of Breaking and Entering of a Building with Intent to Commit a Felony or Larceny and Amend the Conditions that Result in a Petition for Expunction Being Denied, S.L. 2023-103, § 5(b), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2023-2024/SL2023-103.pdf.

performance of the duties of the office." *Id.* If that language sounds familiar, it is—the bond-action statute uses parallel phrasing. That provision—echoing Section 7A-174—allows "[e]very person injured" to sue an officer on his bond "for the due performance of [the officer's] duties in office." N.C.G.S. § 58-76-5. So a citizen may recover on a bond for the same reason a magistrate must obtain one: To ensure the "due" or "faithful" performance of his official duties.

I think that shared language signals a shared meaning. *See United Savings Assn. v. Timbers of Inwood Forest,* 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (cleaned up)). It also triggers a cardinal rule of construction: When statutes cover the same "matter or subject," this Court must construe them together *in pari materia. DTH Media Corp. v. Folt,* 374 N.C. 292, 300 (2020) (cleaned up). That requires us to harmonize the legislature's language, giving "effect, if possible, to all provisions without destroying" their meaning. *Id.* (cleaned up).

And here, reading Section 7A-174 *in pari materia* with the bond-action statute undercuts the majority's narrow construction. Because of his public office, a

---

Because that repeal took effect on 21 July 2023, the majority's holding applies to a narrow universe of claims—those filed before the repeal of N.C.G.S. § 7A-174.

magistrate—just like a county officer—wields heightened power. To ensure responsible use of that power and the faithful performance of his official duties, a magistrate—just like a county officer—must secure a bond. When a magistrate—just like a county officer—engages in "neglect, misconduct, or misbehavior in office," he deviates from "due performance of [his] duties." *See* N.C.G.S. § 58-76-5. And when those actions injure a person, a magistrate—just like a county officer—effected that harm "by virtue or under color of [his] office." *See id.*

In that case, allowing injured citizens to seek relief realizes the purpose of a magistrate's bond and the purpose of a bond action. And so reading "officer" to cover magistrates harmonizes overlapping statutes, giving effect to what the legislature enacted and the language it used. By coupling magistrates' bond requirement with a broadly phrased waiver of immunity on those bonds, the legislature designed a principled scheme. One that anchors magistrates, like other public officers, to the people they serve.

But in its reading of the bond-action statute, the majority shunts aside Section 7A-174, effectively nullifying that provision's text and its purpose in requiring magistrate bonds. If, as the majority says, no one may sue a magistrate on his bond, then that bond is but a piece of paper. It has no function but to enrich bond companies who receive payment without ever needing to compensate injured people. And without any recourse under it, a magistrate's bond cannot—as the legislature intended and enacted—ensure "faithful performance of the duties of the office."

N.C.G.S. § 7A-174. It is, in a word, surplusage. I do not think the General Assembly intended for magistrates' bonds to be a ticket to nowhere.

In short, I would give "other officer[s]" its ordinary meaning—a meaning that fits with its broader legal use and the rest of the statute's language. I think it significant that the statute says "officer" without qualifying that label or limiting its reach to specific strata of government. Other textual clues underscore that broad sweep. We know that the legislature included a catch-all phrase to widen the statute's aperture. We know, too, that the statute does not focus on an officer's precise job title, but on whether he caused injury "by virtue or under color" of his office. And we know that a magistrate's bond ensures the "faithful performance" of his duties—language echoed by the bond-action provision and consonant with its purpose. *See* N.C.G.S. § 7A-174.

More fundamentally, the majority's interpretation of the bond-action statute bleeds Section 7A-174 of meaning. If the General Assembly ordered magistrates to secure bonds but barred citizens from suing on them, then those bonds and the statute requiring them were little more than inkblots. And so on the majority's view, Section 7A-174 meant nothing—not when the legislature enacted it in 1965 and not in the nearly 60 years since. I cannot afford the bond-action statute such a piecemeal, disjointed interpretation.

Thus, giving "officer" its straightforward interpretation with an eye toward context and structure, the bond-action statute covers magistrates. For that reason, I

would rely on "the words actually used in [the] statute" and decline to "insert words not used in the relevant statutory language during the statutory construction process." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258 (2016) (cleaned up).

**B. The *Ejusdem Generis* Canon**

In constricting the bond-action statute, the majority relies on the *ejusdem generis* canon. When general words follow specific ones, it reasons, the latter must cabin the former. And since the bond-action statute lists county officials before "other officers," the majority restricts that phrase to county officials, too.

But *ejusdem generis*—like every interpretive canon—is but a tool for divining legislative intent. *See State v. Fenner,* 263 N.C. 694, 698 (1965); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (explaining that "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation" (cleaned up)). It is a fallback means of construction rather than an unflinching "limitation in scope" of a statute's "general words or terms." *Fenner,* 263 N.C. at 698. For that reason, *ejusdem generis* does "not warrant the court subverting or defeating the legislative will." *Id.* And so it does not control "when the whole context dictates a different conclusion." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991); *Rice v. Rehner*, 463 U.S. 713, 732 (1983) (explaining that courts should not use a canon of construction "when application would be tantamount to a formalistic disregard of congressional intent"). As discussed

above and below, I think the "whole context" of the bond-action statute cuts against the majority's cramped reading.

Start with the linchpin of the majority's analysis: Our decision in *Meyer*. In that case, as the majority explains, we considered whether a county agency fell "within the scope of the general terms 'departments, institutions, and agencies' in the State Tort Claims Act." But as the majority tells it, this Court applied *ejusdem generis* "because all of the 'departments, institutions, and agencies' specifically enumerated within the statute were state entities." From that, the majority extracts a general rule: When a statute lists entities within a specific strata of government, that limit applies to any general terms that follow.

But that rendition of *Meyer* omits key distinctions between that case and this one. Reproduced in full, the State Tort Claims Act (STCA) allowed suits "against the State Board of Education, the Board of Transportation, and all other departments, institutions, and agencies *of the State.*" *Meyer,* 347 N.C. at 105 (emphasis omitted) (quoting N.C.G.S. § 143-291(a) (1996)). So unlike the bond-action statute, the STCA expressly limited its scope to a specific sphere of government.

That state-specific qualification mattered to *Meyer*'s analysis. Relying on the statute's textual limit and its mention of particular state entities, *Meyer* read the STCA to "appl[y] only to actions against state departments, institutions, and agencies." *Id.* at 107. By its terms, the statute waived immunity for "the State departments and agencies" but did "not include local units." *Id.* at 106 (quoting

*Turner v. Gastonia City Bd. of Educ.*, 250 N.C. 456, 463 (1959)). And though a county department of social services is an agent of North Carolina's Department of Human Resources, we explained that an "agent of the State and a state agency are fundamentally different and are treated differently by the [STCA]." *Id.* at 107. The provision only authorized "a claim against the State agency." *Id.* at 105 (quoting *Wirth v. Bracey*, 258 N.C. 505, 507–08 (1963)). And since a county entity was "not a state agency," the STCA did not waive its immunity. *Id.* at 104.

Placed in context, *Meyer* did not announce the flat rule the majority wrings from it. Our reasoning in that case tracked the precise statute before us. And since the STCA differs sharply from the bond-action statute, I would not pluck *Meyer*'s analysis from its context. Unlike the provision here, the STCA lacks a catch-all clause. And more importantly, the STCA expressly limited its application to state government entities. In other words, the legislature signaled its intent to treat state and county actors differently. Those textual guardrails shaped how we applied *ejusdem generis*. We did not bar STCA claims against local entities simply because the parties "specifically enumerated within the statute were state entities," as the majority contends. Instead, the provision expressly limited liability to subdivisions "of the State," drawing the very state-local distinction the majority imports into the bond-action statute. So for *Meyer*'s analysis to map onto this case, the bond-action provision—paralleling the STCA—would have to narrow liability to "other officers of the county." It does not.

In more applicable cases, however, this Court has flagged *ejusdem generis* as a particularly poor tool for reading public-officer statutes. In *Ross*, for instance, we considered whether the phrase "any other fiduciary" enlarged the "scope of the embezzlement statute." *State v. Ross*, 272 N.C. 67, 71 (1967) (emphasis omitted). The defendant, a commissioner, urged us to narrow the provision via *ejusdem generis*. *Id.* The statute did not mention commissioners "by name," he noted. *Id.* And commissioners were "not in the same class" as the enumerated officers—officers like a "guardian, administrator, executor, [or] trustee." *Id.* That meant, he contended, that *ejusdem generis* excluded him from the statute's sweep. *See id.*

We rejected that narrow reading. By mentioning "any other fiduciary," we explained, the General Assembly broadened the statute's aperture. *Id.* That language "cannot be ignored." *Id.* And so to carry out the legislature's intent, we focused on the power an officer wielded rather than their job title. *See id.* at 71–72. Like a receiver, we explained, a commissioner functions as "an arm or hand of the court." *Id.* at 71 (cleaned up). Acting "under authority of and subject to the orders of the clerk of the superior court," a commissioner collects and distributes money. *Id.* Since a commissioner wields the authority of the law, "[s]pecial confidence and trust is imposed in him." *Id.* at 72. And so commissioners—like the other officers in the statute—were "fiduciaries whose duties are prescribed by law and who act under the supervision and orders" of a higher power. *Id.* at 71. We thus declined to narrow the statute through *ejusdem generis*. In view of the commissioner's official duties and the

"special confidence" attached to his position, a functional analysis was more faithful to legislative intent. *See id.* at 71–72.

I would take the same approach with the statute here. In my view, the key metric is the power wielded by an officer rather than the label attached to the office. A magistrate—like the other officers listed in the bond-action statute—is clothed with the state's authority. And because of that power, a magistrate—like the other officers—is entrusted with "[s]pecial confidence and trust." *Cf. id.* at 72. Recognizing that fact, the legislature required magistrates—like the other officers—to secure a bond conditioned on the "faithful performance" of their official duties. And because of their official power and the "[s]pecial confidence" placed in them, *cf. id.*, magistrates— like the other officers—should be liable on their bond for their misfeasance in office. Woodenly deploying *ejusdem generis* would yield an unduly narrow reading, converting a tool for discerning intent into one that defeats it.

According to the majority, however, interpreting "other officer[s]" to cover magistrates would nullify the statute's "specific references" to certain officials. If the General Assembly intended to give those "general words" their "unrestricted sense," the majority reasons, it would have deleted the statute's specific enumerations.

But the reverse is true, too. If the legislature wished to adopt the majority's narrow construction, it would have axed the broad reference to "other officer[s]." It could have also inserted the county-level limitation the majority adds to the text. Indeed, the legislature has done just that in neighboring provisions. And as the

majority documents, the legislature has reshuffled and revised the bond-action statute, removing some officers from its scope and restructuring the provisions around it. But the phrase "other officer[s]" has weathered each round of revision. I think its retention is an important clue of legislative intent.

## C. Statutory Context

Statutory context supports what the text says: That magistrates are "officer[s]" liable on their official bonds. In neighboring statutes, the legislature made clear its intent to guarantee citizens a remedy for official misconduct. To advance that goal, other provisions close loopholes to officers' liability on their bonds.

Section 58-72-1, for instance, prevents an officer from escaping suit based on a technical error in his bond or an "irregularity or invalidity in the conferring of the office or making of the appointment." N.C.G.S. § 58-72-1 (2021). The statute specifically applies to bonds issued by a county's board of commissioners—a restriction only relevant for county officials. But that provision—like the bond-action statute—then reaches further, covering "any person or persons acting under or in virtue of any public authority." *Id.* Even if an officer did not properly assume his role and even if the bond itself contains mistakes, those technicalities do not defeat the officer's liability. So long as the bond "purport[ed] to be a bond executed to the State for the performance of any duty belonging to any office or appointment," it provides a "valid" right of action "for the benefit of the person injured by a breach of" its conditions. *Id.*; *accord* N.C.G.S. § 58-72-5 (2021) (imposing a $500 penalty for "[e]very

person or officer of whom an official bond is required" who "presumes to discharge any duty of his office before" securing a required bond).

Against that backdrop, the omission of a county-officer limit from the bond-action statute is especially striking. For when the General Assembly wants to cabin bond provisions to a particular class of officials, it can—and will—do so.

Some provisions focus on state officers. *See, e.g.,* N.C.G.S. § 58-73-1 (2021) (permitting state officials to name an "indemnity or guaranty company" as surety for official bond); N.C.G.S. §§ 58-73-5, -15, -20, -25 (2021) (parsing how a surety company may secure a state officer's bond and the liability that a company may incur on that bond). Other provisions zero in on county officers. *See, e.g.,* N.C.G.S. § 20-114(a) (2021) (providing that the "lawful officers of any county" may be "liable on his official bond" for neglecting or refusing to perform statutory duties).

And most relevant to the bond-action statute, provisions in the same chapter contain the very county-officer limit that the majority adds. *See, e.g.,* N.C.G.S. § 58-72-10 (2021) ("Every treasurer, sheriff, coroner, register of deeds, surveyor, *and every other officer of the several counties* who is required by law to give a bond for the faithful performance of the duties of his office, shall give a bond for the term of the office to which such officer is chosen.") (emphasis added); N.C.G.S. § 58-72-15 (2021) (authorizing the commissioners "of the county in which said officer or officers are elected" to pay the premiums on the bonds of county officers as well as the "assistants,

deputies or other persons regularly employed in the offices of *any such county officer or officers*") (emphasis added).

The legislature also provided county-specific enforcement mechanisms for county-specific bonds. Section 58-72-20 requires that county officers' bonds be "carefully examined on the first Monday in December of every year" to ensure sufficient collateralization. N.C.G.S. § 58-72-20 (2021). If a county officer fails to renew his bond, the county's board of commissioners must "declare his office vacant" and "appoint a successor." N.C.G.S. § 58-72-25 (2021). The citizens of a county also have statutory recourse. If they reasonably suspect that "the bond of any officer of such county" is inadequately secured, those citizens may request—and a judge may require—that the county officer appear in court and prove the validity of his bond. N.C.G.S. § 58-72-35 (2021).

Those examples underscore the same point: The General Assembly is well-versed in the legal regimes surrounding state and county officials. And when it intends to limit a bond provision to one strata of government, it can—and will—add that restriction in the text. But the bond-action statute—unlike the provisions surrounding it—contains no such limit. I would not insert a constraint where the legislature has not.

**D. History**

Though the majority offers a thoughtful survey of the statute's evolution, I think the history is less clear-cut than the majority suggests.

A century ago, North Carolina's bond statutes looked quite different. As the majority recounts, the chapter dealing with public officer bonds once contained separate provisions listing "State Officers" and "County Officers." N.C. Revised Code of 1905, ch. 9, §§ 287–306 (1905). In current form, the bond-action statute mentions some of the county-level positions it did a century ago. Per the majority, that continuity shows that the legislature has "historically categorized" those positions "as county officers." And that "historical classification," the majority contends, reflects the legislature's intent to limit suits to "only bonded county officers." By drawing that line, the majority concludes, the legislature "necessarily exclude[d]" state officers— like magistrates—from liability on their bonds.

I take different lessons from that history. While the 1905 code parceled out which state and county officers needed to secure bonds, it provided a single cause of action on those bonds. *See* N.C. Revised Code of 1905, ch. 9, § 281. And the bond-action statute of 1905 is nearly identical to the one we have today, including the catch-all phrase "or other officer[s]." *See id.* More tellingly, the legislature inserted that broadly phrased cause of action *before* the provisions listing state and county officers. In other words, though some portions of the code distinguished state officers from county ones, the bond-action statute then—like the bond-action statute now—did not draw the same lines. *See id.*

That was not an oversight. Like the statutory scheme we have today, the 1905 code prescribed specific rules for specific classes of public officers. Section 308, for

example, required the officers "of the several counties" to examine their bonds on the first Monday of each December. *Id.* § 308. Even more, the code set separate rules for who could serve as sureties for the bonds of state officers versus officers in a "county, city, town or township in this state." *Compare id.* § 272 (addressing state officials), *with id.* § 273 (addressing local officials).

The point is that the 1905 code—like the regime we have today—is replete with examples of the legislature expressly distinguishing between and dictating separate rules for state and local officers. But that differential language never made its way into the bond-action statute. Then, as now, the legislature kept the broad reference to "other officer[s]." To now restrict that phrase to county officers would stray from history, not follow it.

In broader perspective, too, the statute's history suggests a shift towards inclusion. Though earlier laws split state officers from local ones, the General Assembly scrubbed that divide from the current statutory regime. *Compare* N.C. Revised Code of 1905, ch. 9, *with* N.C.G.S. §§ 58-73 to -76 (2021). By puncturing the wall between state and local officers, the modern bond-action statute emphasizes the common thread between public servants. Whether an official serves the state or a county, he is entrusted with power greater than his own. And with that power comes the potential to misuse it and cause harm. By retaining the broadly phrased cause of action while erasing the once-strict barriers between state and county officers, the legislature has signaled that an officer's public position—not their place in the

government hierarchy—dictates the need for both a bond and a bond action.

While reasonable minds can extract different insights from history, one lesson is irrefutable: Throughout the life of the bond-action statute, the General Assembly has revised it when it saw fit. It has excised some positions, renamed the provision, and restructured the broader statutory scheme. The legislature does not need this Court to tinker with the language it has enacted and retained for well over a hundred years. If it wanted to restrict bond suits to county officials, it would have done so.

## E. Purpose

Ultimately, statutory analysis must embrace "the spirit of the act" and what it "seeks to accomplish." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001) (cleaned up). And here, the legislature enacted the bond-action statute to secure citizens' rights, furnish a remedy for injuries, and hold public officers accountable to the people they serve. *See Kivett,* 106 N.C. at 569.

To that end, this Court has read the bond statute against the backdrop of contract law, specifically principles of third-party beneficiaries. A statute created for the public "must be considered as in contemplation of the parties in making a contract." *State ex rel. Dunn v. Swanson*, 217 N.C. 279, 281 (1940). And when the legislature addresses "the liability of the parties to the public," the provision "becomes an enforceable part of the contract made for their benefit." *Id.*; *see also State ex rel. Williams v. Adams*, 288 N.C. 501, 504 (1975); *State ex rel. Cain v. Corbett*, 235 N.C. 33, 39 (1952) (construing bond-action statute by drawing on the principle "that where

*Earls, J., concurring in part and dissenting in part*

a contract between parties is made for the benefit of a third party, the latter is entitled to maintain an action for its breach").

On that view, official bonds provide both a sword and a shield. They shield citizens by incentivizing public officers to "du[ly] perform[]" their duties and responsibly wield their power. *See* N.C.G.S. § 58-76-5. And when an officer misuses his office, bonds provide a sword, allowing a person to recover for injuries flowing from that malfeasance. On both scores, bonds recognize that public officers are—and should remain—officers of the public. Because they wield the people's sovereign authority, those officers must act with awareness and accountability.

By allowing bond suits, the legislature also recognized a practical truth: That a private citizen and a public official are "not on equal terms." *State ex rel. Price v. Honeycutt,* 216 N.C. 270, 276 (1939). When an officer acts, he does so under "color of an authority which" a citizen is "bound to respect." *Id.* And practically speaking, citizens have little choice but "to accept the official services of such officers." *Kivett,* 106 N.C. at 569. Citizens must thus "rely on the restraint which the law throws around" a public officer while "at the same time it clothes him with power." *Price,* 216 N.C. at 276.

For that reason, courts may not turn a blind eye when an officer "begins to violate his duty and inflict injury under color of his office." *Id.* For a government official "possesses a far greater capacity for harm" than a citizen "exercising no authority other than his own." *Bivens,* 403 U.S. at 392. And at its most basic, the

"guaranty provided by law" is that "official duty shall not be disregarded" nor "the delegated power abused." *Price,* 216 N.C. at 276. The bond-action statute realizes that principle. By converting an officer's bond into a cause of action to remedy official malfeasance, the statute leaves citizens "secure in their rights," furnishes an "adequate remedy for wrongs done," and holds public servants "to a faithful discharge of their duties as such." *Kivett,* 106 N.C. at 569.

More broadly, the bond-action statute taps into principles of legitimacy and justice. As this Court once recognized, the "law is never more definitely on trial" than "when it comes in contact with the public in its execution." *Price,* 216 N.C. at 276. Faced with that friction, courts should "preserve the respect the people have for [the law] as an instrument of justice" and forestall "the spirit of just resentment against oppression, which often flares into rebellion." *Id*. The bond-action statute prefigures that problem and provides one solution: It grants citizens a mechanism to ensure that "official duty shall not be disregarded" nor "delegated power abused." *Id*. And so when a public official acts "under color of his office down to the point where he is remiss in his duties," courts may not bury their head in the sand. *Id*. In those cases, justice requires what the bond-action statute authorizes: When a public officer abuses his power, he may not shed "his official character" and escape "into the first person singular, to the relief of his surety." *Id*.

For these reasons, I would hold that magistrates are "officer[s]" covered by the bond-action statute. That reading aligns with the provision's text, structure, purpose,

and context. Though I agree with the majority that judicial immunity applies to official capacity claims, I would decline to immunize Magistrate Frederick for his nonjudicial acts. On sovereign immunity grounds, I think that the state consented to suit on a magistrate's official bond. I would thus give Mr. Wynn his day in court and hold that the bond-action statute allows him to seek relief from Magistrate Frederick on the magistrate's bond.

Justice RIGGS joins in this concurring in part and dissenting in part opinion.